**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LOIS A. OHMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 04 C 5365** |
| **vs.** | ) | |
| | ) | **Magistrate Judge Morton Denlow** |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case comes before this Court on the Plaintiff's motion for summary judgment or remand and the Defendant's motion for summary judgment. Plaintiff, Lois A. Ohms, ("Plaintiff" or "Claimant"), challenges the decision of Defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Defendant" or "Commissioner"), claiming that her denial of Plaintiff's request for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") should be reversed or remanded because the Administrative Law Judge ("ALJ"): (1) erroneously failed to give controlling weight to the treating psychiatrist's opinion, (2) erroneously failed to consider concessions made by the medical and vocational experts on cross examination, and (3) erred in finding the Claimant not credible. For the reasons stated below, this Court denies Plaintiff's motion for summary judgment, grants Plaintiff's motion for remand, and denies the Commissioner's motion for summary judgment.

# I. BACKGROUND FACTS

## A.    PROCEDURAL HISTORY

Claimant filed an application for DIB and SSI on May 8, 2001, alleging a disability since December 7, 1999.  R. 109-111.  The application was denied initially, R. 71-74, and again upon reconsideration.  R. 76-79.  On April 17, 2003, Administrative Law Judge Cynthia M. Bretthauer ("ALJ"), held a hearing on the question of disability.  R. 21-67. Claimant, who was represented by counsel, testified at the hearing.  R. 26-54.  Dr. Michael Rabin, a clinical psychologist, R. 54-60, and James Radke, a vocational expert, also testified. R. 60-67.

On August 22, 2003, the ALJ issued her decision, R. 10-20, and determined that Claimant was not disabled.  The ALJ found that notwithstanding her severe impairments due to asthma/allergies, anxiety disorder, obesity, headaches, and GERD, her limitations did not prevent her from performing her past relevant work as a data entry clerk or other work in significant numbers in the regional economy.  R. 19.  On June 28, 2004, the Appeals Council denied the Claimant's request for review.  R. 6-7.

The Claimant now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  The parties have consented to this Court's jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c)(1).  The Court conducted an oral argument on October 3, 2005.

**B.     HEARING TESTIMONY - APRIL 17, 2003**

**1.  Claimant's testimony**

Claimant was 47 years old at the date of the hearing.  She has a high school education.  R. 27.  She lives with her husband and two children, ages 13 and 20, at the time of the hearing.  R. 26.  She weighed 215 pounds and was 5'8" tall.  R. 46.  Her past work experience includes employment as a data entry clerk, office supervisor, retail salesperson, and travel agent.  R. 27.

At the hearing, Claimant testified she was unable to work due to asthma and panic attacks, and her allergies and other health problems, including depression and migraine headaches, made it difficult for her to leave the house.  R. 25, 27-28.  Her asthma and panic attacks existed while she was still employed, but they continually got worse until she could no longer work at the end of 1999.  R. 28.  She had difficulty distinguishing whether she was experiencing a panic attack or an asthma attack, and she was still working on differentiating between the two at the time of the hearing.  R. 46.

When she worked at the travel agency in 1999, she missed about one day, sometimes two, of work a week due to the attacks.  R. 49.  She estimated that in early 2001 she had panic attacks two to three times a week, but they were not as severe as they became later.  R. 45.  By the next year, she had them three to four times a week if she went out, but she was not having them in the house.  *Id.*  As of 2003, she had panic attacks daily, often triggered by leaving the house, R. 34, but she would also have them while inside the house.  R. 35-36.

During a panic attack, she would feel very warm and have difficulty breathing, her head would start to hurt, and her heart felt like it was "going to come right out of [her] chest." R. 35. When she was outside the house, she felt she had to return to somewhere safe. *Id.* Part of her therapy included encouraging her to get out of the house. R. 36. She tried to leave the house everyday and walk to the corner and back. R. 53. She also drove to the cemetery two miles away, once per week, as part of this therapy and tried to take walks around the neighborhood, but she could not and had to return home. R. 26-27, 36. She could walk about one block before she needed to use an inhaler. R. 38.

On a typical day, she woke up, sent her daughter off to school, did a nebulizer breathing treatment, and lay down for about an hour. R. 39. When she got up, sometimes she painted with watercolors, read, or just sat. R. 39, 41. In the afternoon, she did another breathing treatment and then lay back down for an hour to an hour and a half. R. 39, 42. She had dinner with her family, watched television with her husband, sometimes they played cards, and then she went back to bed. R. 39.

She used the home nebulizer a minimum of three times a day; in the morning, afternoon, occasionally in the evening, and before she went to bed. R. 32. The treatments lasted about 20 minutes, R. 33, and made her very jittery and jumpy. R. 43. She had to wait a half-hour or 45 minutes until her body settled back down to relax. R. 43. During that time, she could not engage in any household activities or focus. *Id.*

She sometimes cooked meals and did some housecleaning.  R. 39.  She rarely went grocery shopping.  R. 40.  She did not have any hobbies besides painting, and she did not go out to eat, to the movies, or to religious services.  R. 41.  She went to a family reunion the previous year but only stayed for 20 minutes and returned home.  R. 34-35.  Her friends and family visited her from time to time, and she went to her mother's house about once a month.  R. 41.  In July 2002, she and her family drove to Virginia to visit relatives.  R. 35.  She took her nebulizer with her every time she went out.  R. 45.

At least twice a week, she had recurrent nightmares, which caused her heart to race, involving the death of her ex-husband, who died suddenly from a heart attack in January 2000.  R. 42, 50, 52.  If she had a nightmare, she usually stayed up two to two and a half hours after waking.  R. 42.  She got tired during the day because she was not sleeping well at night.  R. 42.

She had monthly migraines that coincided with her menstrual cycle.  R. 37.  Her migraines usually lasted three, sometimes four, days.  R. 43.  She increased her dosage of Xanax for the first two days of the migraine; the first day so she could sleep the whole time, and the second day to take the edge off the headache.  R. 44.

Since July 2002, she had a one-hour session every four to six weeks with her psychiatrist, Dr. Marianne Geiger, and had one-hour sessions with the social worker at least once a week.  R. 29-30.  She took Xanax, Seroquel, and Luvox, all prescribed by Dr. Geiger.  R. 30-31.  She also took Prednisone and said that it caused her to gain weight and to have "jittery jumpiness." R. 38.  In 1999, she weighed just under 150 pounds, but had gained 60

pounds since then. R. 46. She had allergic reactions to certain colognes and perfumes, dust, an extreme amount of paper, animals, pollen, mold, cats, chemicals like bleach, and certain smells. R. 47. She smoked 5 cigarettes a day. R. 33.

### 2. Dr. Michael Rabin - Medical Expert ("ME")

Dr. Michael Rabin, a Licensed Clinical Psychologist, testified at the hearing regarding the Claimant's mental impairments. R. 54, 100. He testified that she had a depressive disorder, anxiety disorder, and panic disorder. R. 54, 59. He was concerned that her psychiatrist, Dr. Geiger, diagnosed post-traumatic stress disorder (PTSD) rather than panic disorder, and he did not see sufficient symptoms to justify the diagnosis of PTSD. R. 55, 58-59. He determined that she would have the following functional limitations: mild limits in activities of daily life; marked difficulty in maintaining social functioning because of her fear of leaving the house; mild difficulties in concentration, pace and attention; and no decompensations. R. 57, 58.

He testified that the extreme limitations assessed by Dr. Geiger were not supported by her diagnosis or her records. R. 57. The examiners who had seen the Claimant shortly before Dr. Geiger did not see "anywhere near as severe limits" as Dr. Geiger. *Id.* He testified that the claimant was able to leave the house at times, but not very frequently. R. 58. He stated, "It's not as though she's terrified leaving the house no matter what. She does go out of the house." R. 58-59. He would not answer questions about her medication because he was not a physician, only a psychologist. R. 60.

Dr. Rabin also testified that Dr. Geiger indicated that Claimant does not have panic

attacks because on one of her assessments she crossed out panic disorder and put in PTSD and depressive disorder. R. 59. He stated that although there must be some reason for the diagnosis, he was not sure why Dr. Geiger did not diagnose panic attacks. *Id.* He further stated that it would be helpful to get an explanation from Dr. Geiger about her assessment. R. 60.

### 3. James Radke - Vocational Expert ("VE")

James Radke, a VE, testified at the hearing regarding existing jobs in the economy that might be suitable for Claimant. R. 61, 63-64. The ALJ asked the VE to consider an individual who is 47 years old, with the same work and educational experience as Claimant, with no exertional limitations, who must avoid concentrated exposure to dust, odors, fumes, and gases, who cannot have regular general public contact and should work primarily alone, but could be in proximity to co-workers without having to interact with them on a regular basis. R. 62. The VE responded that such an individual could perform Claimant's past relevant work as a data entry clerk. *Id.* If the hypothetical individual required a low stress job, data entry clerk would not be available. R. 63. However, library clerks, mail clerks, assemblers, and hand packers would be available. R. 63-64. If the individual added the requirement to avoid even moderate exposure to pulmonary irritants, dusts, fumes, and gases, it would be hard for him to determine whether she could perform the above mentioned jobs. R. 66.

If the person could not leave the house and commute to work more than two times a month, there would be no full-time job available. R. 64. If the individual was able to attend

work on a regular basis but had to leave early two days a week because she experienced a panic or asthma attack, she would not be able to sustain gainful activity. R. 65. If the person had to take an additional 20 minute break tacked onto her lunchtime in order to administer a nebulizer treatment, after a few weeks, the person would have a hard time maintaining employment. R. 65-66.

## C. MEDICAL EVIDENCE - PHYSICAL HEALTH

### 1. Dr. Anthony Halat - Internal Medicine - August 2000-July 2001

On August 29, 2000, Dr. Anthony Halat first saw Claimant for a follow-up to a hospital admission for pneumonia. R. 214. He also treated her on September 5, 2000 for an asthma attack with steroids and antibiotics; on October 6, 2000 for acute pharyngitis and bronchitis; on October 13, 2000 for asthma and disabling cough; on January 25, 2001 for allergic rhinitis; and on March 5, 2001 for allergic rhinitis. *Id.* Dr. Halat identified anxiety, stress, pollen, and hormone imbalance as factors precipitating asthma attacks. R. 215.

He stated that Claimant had major depression and generalized anxiety that would limit her activities, interests and ability to relate to others because of labile moods, increased desire to sleep, and anger episodes. R. 217. He prescribed Wellbutrin from October 2000 to April 2001 for her emotional condition and Xanax from 1999 to July 2001. *Id.*

### 2. Dr. Matthew Ewald - Consultative Exam - August 2001

On August 10, 2001, Dr. Matthew Ewald, a Diplomate in Family Medicine, performed a consultative examination of Claimant. R. 221-23. Claimant complained that she became short of breath with walking, had a daily cough, and allergies with worse symptoms in the spring and summer. *Id.* She had bilateral wheezes, but did not use

accessory muscles to breathe.  R. 222.  Dr. Ewald diagnosed asthma and allergies.  R. 223.

### 3.    Dr. Joseph Eckberg - Family Practice - October 2001-February 2002

On October 29, 2001, Claimant saw Dr. Joseph Eckberg to establish care and obtain refills of her medications.  R. 272.  She had a history of asthma, allergies, GERD, hepatitis B, episodes of pneumonia, and herpes.  *Id.*  On exam, she appeared well and was in no acute distress.  R. 273.  Dr. Eckberg diagnosed asthma and allergic rhinitis.

On November 23, 2001, she visited Dr. Eckberg reporting having a cold.  R. 274.  He diagnosed mild asthma exacerbation and prescribed prednisone in addition to her usual medications.  *Id.*

On February 15, 2002, Claimant reported to Dr. Eckberg that she had been wheezing a lot that week.  R. 276.  He diagnosed mild asthma exacerbation, panic attacks, and allergies.  *Id.*  He adjusted her medications with a follow up in a month for her breathing and anxiety.  R. 277.

#### 4.     Dr. Marchele Bowen - Family Practice - December 2001-October 2002

On December 19, 2001, Claimant saw Dr. Marchele Bowen to discuss her migraine headaches.  R. 275.  She reported that she had tried various medications, but they were all ineffective except for Xanax.  *Id.*  Dr. Bowen prescribed Atarax instead of Xanax.  *Id.*

On April 11, 2002, Claimant complained of increased migraines that coincided with her more frequent menstrual cycle.  R. 287.  Dr. Bowen diagnosed hypertension, panic disorder and anxiety disorder, and menopausal symptoms.  R. 288.  Dr. Bowen prescribed Elavil for her migraines.  *Id.*  Claimant returned a couple weeks later and again in May; each time, Dr. Bowen adjusted her medications.   R. 282-286.

On October 9, 2002, Claimant saw Dr. Bowen complaining of a cold.  R. 315.  She reported using her Albuterol four to five times a day, which was a little more than usual.  *Id.*  Dr. Bowen described Claimant as having a history of "somewhat volatile asthma" and prescribed increased medications for congestion and asthma.  *Id.*

#### 5.     Dr. George Kudirka - Physical Residual Functional Capacity Assessment December 2001

Dr. George Kudirka, a state agency physician, reviewed Claimant's file on December 5, 2001.  R. 263 – 270.  Dr. Kudirka diagnosed asthma and noted that Claimant had asthma with attacks precipitated by allergies, anxiety, and hormonal imbalance.  R. 263, 270.  He stated that she should avoid job cites with excessive respiratory irritants.  R. 267, 270.  He did not find any exertional limitations.  R. 264.

**D.      MEDICAL EVIDENCE - MENTAL HEALTH**

**1.      Dr. John Peggau - Consultative Psychological Evaluation - October 2001**

On October 15, 2001, Dr. John Peggau, a Clinical Psychologist, performed a consultative psychological evaluation of Claimant for purposes of her disability claim.  R. 225-27.  Claimant reported that she had some form of panic attacks, for which she took Wellbutrin and Alprazolam (Xanax).  *Id.*  Claimant said her asthma flares up when she starts to anticipate problems.  *Id.*  She also reported that she quit her travel agent job in October 1999 because she had health problems related to her asthma and was being harassed for missing work.  *Id.*  Dr. Peggau described her mood as "bright" and her affect as "appropriate."  R. 226.  Dr. Peggau said he did not note any particular psychological problems during the evaluation, *Id.*, and she had no signs of depression.  R. 227.  He concluded that she would be able to work with co-workers, supervisors, and the public.  R. 227.

**2.      Dr. Eckberg and Dr. Bowen - Family Practice - February-April 2002**

On February 15, 2002, while seeing Dr. Eckberg for her wheezing problems, Claimant reported that she had been experiencing a lot more panic attacks over the previous three months.  R. 276.  Upon examination, Dr. Eckberg found that she seemed a little anxious.  *Id.*  He diagnosed mild asthma exacerbation, panic attacks, and allergies.  *Id.*  He adjusted her medications and prescribed Paxil with a follow-up in a month for her breathing and anxiety.  R. 277.

On April 11, 2002, Claimant told Dr. Bowen that her panic attacks were becoming

more frequent and invasive, that she was once unable to leave a department store because she could not get in her car, and that many times she was unable to leave her home because she was afraid of getting in her car. R. 287. Dr. Bowen diagnosed hypertension, panic disorder and anxiety disorder, and menopausal symptoms. R. 288. Dr. Bowen continued her Paxil prescription and also instructed Claimant to contact a psychiatrist for help with her panic disorder. *Id.*

On April 22, 2002, Claimant returned to Dr. Bowen for a follow-up. R. 286. She reported that her panic attacks were becoming more pervasive and that she did not think the Paxil was helping. *Id.* Dr. Bowen increased her Paxil for the panic attacks. R. 283.

### 3. Dr. E. Kuester - Mental Residual Functional Capacity Assessment March 2002

On March 24, 2002, Dr. E. Kuester reviewed Claimant's file. R. 245 – 262. The psychiatrist diagnosed anxiety not otherwise specified (NOS), R. 249, 254, and determined that she was moderately limited in her ability to carry out detailed instructions, R. 245, and she could perform simple tasks in a regular work setting if not required to deal with the public. R. 247.

### 4. Dr. Marianne Geiger - Psychiatrist - August 2002 – February 2003

On August 15, 2002, Claimant received an intake evaluation at the Marianne Geiger, M.D. Clinic of Psychiatric Care. R. 293. Claimant's chief complaints were anxiety and fear of leaving the house. *Id.* She reported fear of being around people because she thought they might make her sick. *Id.* Claimant stated that her initial difficulties with stress began when

her ex-husband died in 2000 then after her minister died, she felt that she needed someone to talk to.  *Id.*

In an undated letter, Donald Lee, a clinical social worker, stated that he had seen Claimant for two individual therapy sessions on August 15 and August 21, and that he believed her diagnosis to be panic disorder with agoraphobia.  R. 291.  Claimant reported daily panic attacks and high anxiety.  *Id.*  He opined that she could not function in any work environment.  *Id.*

On August 26, 2002, Claimant saw Dr. Geiger for medication management.  R. 296. Claimant reported that she was not sleeping well and that the psychotropic medications she received from her family doctor were not working.  *Id.*  Claimant stated that she became short of breath, had chest pain, flushing, and hot flashes, and that she had nightmares almost every night.  *Id.*  Dr. Geiger prescribed Seroquel and discontinued Amitriptyline (Elavil).  *Id.*

Claimant had fourteen therapy sessions between September 4, 2002 and February 25, 2003.  R. 297-299, 301-302, 304-307, 309-312, 314.  Although the session notes are unsigned, they appear to be from Donald Lee.  One of her treatment goals was for continual daily attempts to go out of the house on a limited basis.  R. 295.

On September 17, 2002, Dr. Geiger filled out a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" for Claimant.  R. 292-292A.  She reported that Claimant had "no useful ability to function" in most work related mental activities.  *Id.*

On September 26, 2002, Claimant saw Dr. Geiger for medication management.  R. 300.  Dr. Geiger prescribed Xanax and Luvox and continued the Seroquel.  *Id.*  Dr. Geiger

noted "how to tell the difference between panic and asthma." *Id.* Dr. Geiger's assessment was R/O (rule out) PTSD, obsessive-compulsive disorder, and bipolar. *Id.*

Claimant saw Dr. Geiger for medication management again on October 29, 2002. R. 303. Claimant reported being more anxious and she was still not going out of the house. *Id.* She also reported that Seroquel helped her, and she would take a varying dose if she went out. *Id.* Dr. Geiger assessed PTSD, depression not otherwise specified (NOS), and rule out bipolar disorder. *Id.*

Claimant saw Dr. Geiger for medication management again on December 12, 2002 and February 19, 2003. R. 308, 313. In the December session notes, Dr. Geiger noted "panic attacks still coming." R. 308. On the same note, she crossed out the assessment of panic disorder and instead wrote PTSD and depression NOS. *Id.*

On April 10, 2003, Dr. Geiger wrote a letter stating that Claimant continued to function within the poor categories that Dr. Geiger identified in the assessment on September 17, 2002. R. 317.

## E.    THE ALJ'S DECISION - AUGUST 22, 2003

After conducting the hearing and reviewing the evidence, the ALJ found that Claimant was not disabled within the meaning of the Social Security Act. R. 10 - 20. Although she determined that Claimant had severe impairments due to asthma/allergies, anxiety disorder, obesity, headaches, and GERD, the ALJ concluded that her limitations did not prevent her from performing her past relevant work as a data entry clerk or other work in significant numbers in the regional economy. R. 19.

14

The ALJ assessed Claimant's application for DIB under the five-step sequential analysis. *See infra*, Part II.B (describing the disability standard of review). Under step one the ALJ found that Claimant did not engage in any substantial gainful activity since her alleged onset date. R. 14, 19.

Under the second step, the ALJ. determined that the Claimant's asthma/allergies, anxiety disorder, obesity, headaches, and GERD were severe impairments. R. 15, 19. At step three, however, the ALJ determined that Claimant's severe impairments did not "meet or equal" a listed impairment. *Id*.

At step four, the ALJ determined Claimant's residual functional capacity. The ALJ first noted that Claimant had an anxiety disorder and a depressive disorder, NOS. R. 17. She stated that the great weight of evidence established that Claimant has mild limitation in restriction of activities of daily living and in concentration, persistence, and pace, marked limitation in maintaining social functioning, and no repeated episodes of decompensation. *Id*. The ALJ then considered that Claimant could attend to her own personal needs. R. 17. The ALJ also stated that in Claimant's testimony, she "offered no side effects from [her] medications." R. 18.

The ALJ considered the ME's testimony that Dr. Geiger's records did not support her diagnosis of PTSD, and that her extreme limitations were not supported by the treatment records or her own diagnoses. R. 16. Additionally, no previous examiner assessed such severe limitations. *Id*. Therefore, the ALJ concluded that Dr. Geiger's opinion should be

given reduced weight. *Id.* The ALJ "concur[red] with the medical expert's opinion in all regards." *Id.*

The ALJ found that while the objective medical and other evidence established Claimant's impairments were capable of producing pain and limitations, her allegations of the intensity, persistence, and functionally limiting effects of her symptoms were not substantiated by the objective medical or other evidence. R. 18. The ALJ concluded, therefore, that such allegations by Claimant were not wholly credible. *Id.* Accordingly, the ALJ found that Claimant retained the residual functional capacity to perform all exertional levels of work, but should avoid concentrated exposure to dusts, fumes, odors, and gases. *Id.* Furthermore, the ALJ found Claimant should have no regular contact with the general public, work primarily alone, and work in jobs with only a low to moderate stress environment. *Id.*

Under step five, the ALJ determined that based upon her residual functional capacity, Claimant could perform her past work as a data entry clerk. R. 18. The ALJ also determined that Claimant could perform other jobs such as a library clerk, a mail clerk that is not a postal position, an assembler and a hand packer. *Id.* Therefore, the ALJ concluded that Claimant is not disabled. *Id.*

## II.  LEGAL STANDARDS

### A.  STANDARD OF REVIEW

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review is limited

to determining whether the ALJ applied the correct legal standards in reaching his decision and whether there is substantial evidence in the record to support the findings. *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995) (citing *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). A mere scintilla of evidence is not enough. *Id.* Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

While a reviewing court must conduct a "critical review" of the evidence before affirming the Commissioner's decision, *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000), it may not re-evaluate the facts, re-weigh the evidence, or substitute its own judgment for that of the Social Security Administration. *Diaz,* 55 F.3d at 305-06. Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether there is substantial evidence to support the findings. *Scivally v. Sullivan,* 966 F.2d 1070, 1075 (7th Cir. 1991)**.** The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

It is the duty of the ALJ to develop a full and fair record. *Henderson ex rel. Henderson v. Apfel,* 179 F.3d 507, 513 (7th Cir.1999). Failure to fulfill this obligation is "good cause" to remand for the gathering of additional evidence. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000).

## B.    DISABILITY STANDARD

Disability insurance benefits, ("DIB"), are available to claimants who can establish "disability" under the terms of Title II of the Social Security Act, ("Title II").  *Brewer v. Charter*, 103 F.3d 1384, 1390 (7th Cir. 1997).   Supplemental Security Income benefits, ("SSI"), are available to "disabled indigent persons" under Title XVI of the Social Security Act, ("Title XVI").  *Barnhart v. Thomas,* 540 U.S. 20, 24 (2003).   Titles II and XVI of the Social Security Act employ the same definition of "disability." *Id.*   That is, an individual is disabled if that individual has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.  §§ 423(d)(1)(A); 1382c(a)(3)(A).  An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment  that  exists  in  the  national  economy.     42  U.S.C.   §§  423(d)(2)(A); 1382c(a)(3)(B).

To make this determination, the Commissioner must employ a five step sequential analysis.  20 C.F.R. §§ 404.1520(a)-(f); 416.920(a)-(f).  If the ALJ finds at any step of this process that a claimant is not disabled, the inquiry ends.  *Ismahel v. Barnhart,* 212 F. Supp.

2d 865, 872 (N.D. Ill. 2002). The process is sequential; if the ALJ finds that the claimant is not disabled at any step in the process, the analysis ends. *Id.* Under this process, the ALJ must inquire: (1) whether the claimant is still working; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) if the claimant does not suffer from a listed impairment, whether he can perform past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *Id.*

## III. DISCUSSION

Claimant raises three issues for review: (1) whether the ALJ erred in failing to give controlling or great weight to the opinion of Claimant's treating psychiatrist; (2) whether the ALJ erroneously failed to consider concessions made by the medical and vocational experts on cross examination; and (3) whether the ALJ properly found that the Claimant was not credible.

## A.  THE ALJ FAILED TO PROPERLY EXPLAIN THE REDUCED WEIGHT SHE GAVE TO THE OPINION OF CLAIMANT'S TREATING PSYCHIATRIST

Claimant first argues that the ALJ erred by failing to give controlling weight to the opinion of Dr. Geiger, Claimant's treating physician, as required by 20 C.F.R. § 404.1527(d). Specifically, Claimant argues that the ALJ made no attempt to explain how Dr. Geiger's treatment notes failed to support the assessed limitations.  The Claimant lists multiple references in Dr. Geiger's records that support her assessments, including references to: anxiety and fear of leaving the house, R. 296, 303; goals of continued attempts to go out on a limited basis, R. 295; regressing in September 2002, R. 299; "panic attacks still coming" as of December 2002, R. 308; chest pain during anxiety attacks, R. 312; decreased tolerance and increased irritability, R. 312; and feelings of panic around "even thinking about getting in [her] car."  R. 313.

Generally, more weight is given to medical sources who have examined a claimant than to sources who have not.  20 C.F.R. § 404.1527(d)(1)-(2).  This is so especially on issues concerning the nature and severity of a claimant's impairments. SSR 96-5p (1996). Giving more weight to treating sources is appropriate because such sources are most able to provide a detailed, longitudinal picture of a claimant's medical impairment, and "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations."  20 C.F.R. § 404.1527(d)(2).  Moreover, a treating physician's opinion is controlling unless it is unsupported by the objective medical evidence and is inconsistent with other evidence in the

record. 20 C.F.R. § 404.1527(d)(2); *Henderson,* 179 F.3d at 514.

An ALJ can reject an examining physician's opinion if her reasons are supported by substantial evidence in the record; a contrary opinion by a non-treating physician does not qualify as substantial evidence, *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir. 2003). However, it is appropriate for an ALJ to consider opinions of physicians and psychologists who are also experts in social security disability evaluation. *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2003) (citing 20 C.F.R. § 416.927(f)(2)(1)).

The ALJ determined that Dr. Geiger's opinion of the Claimant's limitations as discussed in her two letters was not accompanied by objective medical findings because the ME testified that the psychological records, along with the testimony, did not support a diagnosis of PTSD. Therefore, she concluded Dr. Geiger's opinion should be given reduced weight. R. 16. The ALJ also stated that she concurred with the ME's opinion "in all regards." *Id.* However, the ME expressed confusion about Dr. Geiger's diagnosis and stated that it would be helpful to get clarification from Dr. Geiger. The ALJ did not try to contact Dr. Geiger for clarification. The ME also testified that he could not answer questions about Claimant's medication because he was not a physician.

If the evidence received from a treating physician or other medical source is inadequate to make a determination of disability, those sources must be re-contacted to obtain any readily available additional information. 20 C.F.R. § 404.1512(e)(1). Additional evidence or clarification from a medical source must be sought when there is a conflict or an ambiguity that must be resolved, necessary information is missing, or a report does not

appear to be based upon objective evidence. *Id.*

The ALJ should have contacted Dr. Geiger to receive clarification on her diagnosis of PTSD and how that diagnosis was supported by her treatment notes. *See Ynocencio v. Barnhart*, 300 F.Supp.2d 646, 657 (N.D. Ill. 2004). The ME did not examine Claimant and expressed confusion over Dr. Geiger's diagnosis. The ME even stated that it would be helpful to get clarification from Dr. Geiger. The ALJ erred by completely relying on the ME's testimony without contacting Dr. Geiger for clarification.

Additionally, the ALJ should have contacted Dr. Geiger for further clarification on how Claimant's medications factored into Dr. Geiger's diagnosis and assessment of limitations. The ME admitted that he could not answer questions regarding Claimant's medication because he was not a physician, only a psychologist. Again, the ALJ should not have relied so heavily on the ME's testimony when the ME could not even address the relevant area of Claimant's medications.

Finally, the ALJ did not discuss Dr. Geiger's and Mr. Lee's treatment notes, which indicated on multiple dates that Claimant suffered from panic attacks that prevented her from leaving the house. It is unclear whether the ALJ rejected this evidence and why. Therefore, the ALJ's decision lacks adequate analysis and discussion of the issues, and she did not build an accurate and logical bridge between the evidence and the result. *See Sarchet v. Chater,* 78 F.3d at 307.

There is no indication in the record that the ALJ attempted to resolve these ambiguities and conflicts surrounding Dr. Geiger's opinion and the objective evidence.

Without clarification of these issues, the record is inadequate to make a determination of disability.

**B.   THE ALJ FAILED TO CONSIDER CONCESSIONS MADE BY THE MEDICAL AND VOCATIONAL EXPERTS ON CROSS EXAMINATION**

### 1.  Medical Expert - Dr. Michael Rabin

Claimant next argues that although the ALJ indicates in her decision that she "concurs with the medical expert's opinion in all regards," she failed to credit, or even mention, additional testimony given by Dr. Rabin that was favorable to Claimant.  Dr. Rabin, the medical expert,  indicated that Claimant had a panic disorder, R. 57, she experienced fear of leaving the house, and she was able to leave home "not very frequently but at times."  R. 58. Plaintiff argues that given that the ALJ concurred with Dr. Rabin's medical opinion "in all regards," that she also adopted his expert testimony that Claimant was able to leave home "not very frequently."  If Claimant is restricted from leaving home, then she would require frequent unexpected absences and/or work breaks, were she employed.

Defendant responds that when Dr. Rabin's testified Claimant left the house "not very frequently, but at times," he was only describing how Claimant in fact limited herself, not what she was capable of or what could reasonably be expected given her medical condition. Defendant argues that the record supports Dr. Rabin's idea that she was not always terrified of leaving the house and she was able to go out.

The issue is not whether Claimant was always terrified of leaving the house, but whether she was unable to leave the house so frequently that it would cause her to miss work

more than twice per month or cause her to leave early twice per week. In either case, per the vocational expert's testimony, she could not sustain employment. R. 64-65. Claimant notes that she would likely be absent more than twice per month due to any combination of her panic attacks, asthma, and migraine headaches, and that would preclude employment.

The ALJ must consider all relevant evidence and may not select and discuss only that evidence which favors his or her ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Although a written evaluation of each piece of evidence or testimony is not required, the ALJ must provide her analysis of the evidence at some minimal level. *Id.* In *Barnett v. Barnhart*, the Court of Appeals held that the ALJ erred when he stated he disbelieved the plaintiff's testimony concerning the number of seizures she was experiencing, but he never affirmatively determined how many seizures he believed she actually experienced. 381 F.3d 664, 670 (7th Cir. 2004).

The ALJ found that Claimant's impairments were severe, R. 15, and were capable of producing pain and limitations. R. 18. However, the ALJ also stated she did not find the Claimant's allegations of the intensity, persistence and functionally limiting effects of her symptoms wholly credible. *Id.* By concurring with the ME's medical opinion "in all regards", it follows that the ALJ also concurred that the Claimant was able to leave home "not very frequently." Even if the ALJ did not find Claimant's allegations of the intensity, persistence, and functionally limiting effects of her symptoms wholly credible, the ALJ did agree that Claimant suffered from panic attacks and sometimes could not leave the house. It is unclear how the ALJ could make a determination on Claimant's ability to work without

affirmatively determining how often Claimant could not leave the house or might have to leave work early due to panic or asthma attacks.

## 2. Vocational Expert - James Radke

Further, Claimant argues that the ALJ failed to articulate any basis for rejecting the VE's responses to both the ALJ's own follow-up questions, and to Claimant's cross-examination. The ALJ did not specifically reject Claimant's testimony that she needs at least three nebulizer treatments per day with one in the afternoon that takes approximately twenty minutes to administer, R. 32-33, with residual inability to engage in activities lasting 30 - 45 minutes. R. 43. The ALJ also did not specifically reject Claimant's testimony that she missed one day, sometimes two, per week of work when she was last employed in 1999 before her condition started to become progressively worse. R. 44.

Because Dr. Rabin was not a physician, he could not testify to Claimant's medical treatments, therefore leaving her testimony about her daily nebulizer treatments uncontradicted. Her primary care physicians stated that she had somewhat volatile asthma, R. 315, and had asthma and allergic rhinitis, both poorly controlled. R. 273. The VE testified that any of these symptoms, individually, would cause inability to sustain substantial gainful activity. R. 64-66. The ALJ did not discuss this aspect of the VE's testimony, nor did she explain why she found the Claimant not disabled despite this testimony.

The ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits. *Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir. 2001). In *Zurawski,* although the ALJ supported her decision with some evidence, she made no attempt to explain

why the other evidence in the record, which appeared to favor the plaintiff, was overcome by the evidence on which she relied. *Id.* The court remanded for a re-determination of the plaintiff's residual functional capacity because the ALJ's decision failed to permit an informed review. *Id.*

Again, the ALJ did not discuss or affirmatively determine how often Claimant had to complete her nebulizer treatments, nor did she determine how long the treatments and their after-effects lasted. Because the ALJ did not explain or discuss her reasoning, it is unclear whether she rejected Claimant's testimony about her nebulizer treatments and the length of their effects, or whether she rejected the VE's testimony that having to take breaks during the day would cause her to be unable to sustain employment. Either way, the ALJ did not adequately explain her reasoning. *See Zurawski,* 245 F.3d at 889.

## C.    THE ALJ IMPROPERLY FOUND THAT CLAIMANT WAS NOT CREDIBLE

Claimant argues that the ALJ's credibility determination is insufficient as a matter of law and is patently wrong. Claimant argues that the ALJ stated Claimant's allegations of disabling symptoms and limitations were "not wholly credible", R. 18, which indicates that she did believe the allegations to some extent. However, the ALJ never explicitly stated that she disbelieved any of the symptoms specifically, instead she stated that Claimant's allegations of the "intensity, persistence and functionally limiting effects of her symptoms are not substantiated by the objective medical or other evidence in the case records." R. 18.

Although the ALJ cited the appropriate regulation and ruling, 20 C.F.R. § 404.1529 and SSR 96-7p, when she discussed the evidence supporting her decision, she did not address

many aspects of the Claimant's allegations. For example, the ALJ found that Claimant must have no regular contact with the general public, work primarily alone, and in a low to moderate stress environment, but those limitations do not address the aspects of her panic attacks, which can happen even when she is at home or can be brought on by an asthma attack.

In addition, Claimant argues that the ALJ's credibility determination is based on incorrect facts and improper negative credibility inferences. The ALJ stated that Claimant offered no side effects from her medication. R. 18. However, Claimant testified that Seroquel made her feel dopey and groggy, R. 48, Prednisone made her gain weight and become jumpy, R. 38, and her breathing treatments made her jittery requiring a half-hour to 45 minutes to calm down. R. 43. Remand is warranted where the ALJ makes a decision based upon a mistake of fact on an issue that may have come out differently if the mistake had not been made. *Prak v. Chater*, 892 F.Supp. 1081, 1087 (N.D. Ill. 1995). As discussed *supra*, the ALJ should have contacted Dr. Geiger for clarification on Claimant's medications, if needed, and she ignored Claimant's testimony when she stated that Claimant offered no side effects from her medication.

## IV. REMAND

In this case, remand is warranted because there is reason to believe that it might lead to a different decision. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989). Furthermore, the record is not so clear that benefits can be awarded or denied. *See Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993). The determination of a benefits award is

essentially a factual finding best left to the Commissioner because the record can not yield one supportable conclusion. *Id.*

The Court remands this case so the severity, frequency, and duration of Claimant's conditions can be determined and to clarify any confusion surrounding Dr. Geiger's diagnosis of Claimant.  On remand, the ALJ should at a minimum:

1.  Affirmatively determine the frequency and severity of Claimant's panic and asthma attacks;

2.  Affirmatively determine the required frequency and duration of Claimant's nebulizer treatments including after effects of the treatment;

3.  Obtain further information from Dr. Geiger on her reasoning as it applies to:

    a)  her diagnosis of PTSD and how the diagnosis relates to Claimant's panic attacks;

    b)  how Dr. Geiger assessed the severe limitations for Claimant; and

    c)  how Dr. Geiger's diagnosis and assessment of limitations was influenced by Claimant's medications.

# V. CONCLUSION

For the reasons set forth in this opinion, Plaintiff's Motion for Summary Judgment is DENIED, Plaintiff's Motion for Remand is GRANTED, and the Commissioner's Motion for Summary Judgment is DENIED.

**SO ORDERED THIS 26TH DAY OF OCTOBER, 2005.**

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies Mailed To:**

Barry A. Schultz
The Law Offices of Barry A. Schultz, P.C.
1609 Sherman Ave., Suite 205
Evanston, Illinois 60201

Counsel for Plaintiff

Shefali Baltz
Malinda Hamann
Special Assistant United States Attorney
200 W. Adams St., 30th Floor
Chicago, Illinois 60606

Counsel for Defendant